591 F.2d 944
 192 U.S.App.D.C. 335, 4 Media L. Rep. 1866
 The REPORTERS COMMITTEE FOR FREEDOM OF The PRESS, American
Historical Association, American Political Science
Association, James MacGregor Burns, Nat Hentoff, Donald G.
Herzberg, William Leuchtenburg, Arthur Link, J. Anthony
Lukas, Austin Ranney and Clement E. Vose, Appellants,
v.
Arthur F. SAMPSON, Individually and as Administrator of
General Services, et al.
Lillian HELLMAN et al.
v.
Arthur SAMPSON, General Services Administration, et al., The
Reporters Committee for Freedom of the Press, et
al., Appellants.
Richard M. NIXON, Individually and as the Former President
of the United States, et al.
v.
Arthur F. SAMPSON, Individually and as Administrator of
General Services, et al., The Reporters Committee
for Freedom of the Press, et al., Appellants.
 Nos. 77-2123 to 77-2125.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 31, 1978.
Decided Dec. 21, 1978.
 
 Leonard B. Simon, Washington, D.C., with whom Robert E. Herzstein, Andrew S. Krulwich, Mark J. Spooner, and Peter T. Grossi, Jr., Washington, D.C., were on the brief, for appellants.
 Steven I. Frank, Atty., Dept. of Justice, Washington, D.C., a member of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Earl J. Silbert, U. S. Atty., Barbara Allen Babcock, Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for federal appellees.
 R. Stan Mortenson, Washington, D.C., with whom Herbert J. Miller, Jr., Washington, D.C., was on the brief, for appellee Nixon.
 William A. Dobrovir, Washington, D.C., entered an appearance for appellee Jack Anderson.
 Richard J. Bacigalupo, Charles S. Rhyne, and William S. Rhyne, Washington, D.C., entered appearances for appellee Rose Mary Woods.
 Before WRIGHT, Chief Judge, J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM, Circuit Judge.
 Opinion for the court filed by Circuit Judge TAMM.
 TAMM, Circuit Judge:
 
 
 1
 Appellants here, plaintiffs below, seek access through the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1976), to Richard Nixon's presidential materials, which are in the control of the General Services Administration (GSA) pursuant to title I of the Presidential Recordings and Materials Preservation Act (the Materials Act), note following 44 U.S.C. § 2107 (Supp. V 1975); they also request a declaration that the government owns the materials. The district court granted the government defendants' motion to dismiss the plaintiffs' action on the ground that passage of the Materials Act rendered it moot. Nixon v. Sampson, 437 F.Supp. 654, 656 (D.D.C.1977). We reverse and remand for proceedings not inconsistent with this opinion.
 
 
 2
 * Richard Nixon resigned his office as President of the United States on August 9, 1974. On September 8, 1974, the same day that President Gerald Ford pardoned Mr. Nixon, the White House released the text of an agreement between Mr. Nixon and Arthur Sampson, Administrator of the GSA, concerning Mr. Nixon's presidential materials.[1] Under the terms of the agreement, Mr. Nixon retained all legal and equitable title to the materials and the GSA agreed to house them. Access to the materials was strictly limited. Mr. Nixon agreed to deposit materials other than the tape recordings described below for three years, during which no one could gain access without his approval. Mr. Nixon reserved the right to withdraw any materials he desired after three years. Tape recordings of White House or Executive Office Building conversations were to remain on deposit until September 1, 1979, and access was limited to persons approved by the former President. After September 1, 1979, GSA agreed to destroy tape recordings upon Mr. Nixon's request. Finally, all tape recordings were to be destroyed when Mr. Nixon died, or on September 1, 1984, whichever event occurred first.
 
 
 3
 On October 17, 1974, Mr. Nixon brought a suit seeking a temporary restraining order and preliminary injunction to enforce the Nixon-Sampson agreement.[2] Four days later, Jack Anderson, a journalist whose FOIA request for presidential materials had been denied on the basis of the Nixon-Sampson agreement, intervened to prevent implementation of the agreement.[3] Also on October 21, 1974, the Reporters Committee for Freedom of the Press, et al.,[4] appellants here, filed suit seeking to restrain the agreement and to obtain access to the materials pursuant to the FOIA.[5] Three days later, Lillian Hellman and other members of the Committee for Public Justice, filed a similar action which sought specified presidential tape recordings.[6] All of these actions were consolidated.
 
 
 4
 On December 19, 1974, President Ford signed into law the Presidential Recordings and Materials Preservation Act, which included a provision giving the United States District Court for the District of Columbia exclusive jurisdiction to hear any challenges to the constitutionality of title I of the Act.[7] Mr. Nixon immediately filed a suit, Nixon v. Administrator,[8] to enjoin the operation of the Materials Act and asked that a three-judge court be convened to hear his constitutional challenges.
 
 
 5
 Before Mr. Nixon's request was acted upon, the district court issued an opinion in the consolidated cases, Nixon v. Sampson, 389 F.Supp. 107 (D.D.C.1975), but entry of the order implementing the opinion was stayed by this court pending the convening of a three-judge court.[9] The three-judge court held that the Materials Act was facially constitutional,[10] and the Supreme Court affirmed.[11] Nixon v. Administrator, 408 F.Supp. 321 (D.D.C.1976), Aff'd, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).
 
 
 6
 After the Supreme Court's decision, attention turned again to the consolidated cases, Nixon v. Sampson. The government defendants moved to dismiss the actions as moot in light of Nixon v. Administrator. Appendix at 67. The district court granted the motion, Nixon v. Sampson, 437 F.Supp. at 656. The district court held that the Materials Act's access provisions mooted the requests for presidential materials under the FOIA and the Materials Act's provision guaranteeing the government's custody and control of the materials mooted the ownership issue. Id. at 655-56. Mr. Nixon, who supported the government defendants' motion to dismiss, Id. at 655 n. 5, joins those defendants as an appellee in this challenge to the district court's decision.
 
 II
 
 7
 Appellees argued in the district court that the Materials Act provides the exclusive means for obtaining access to the recordings and materials. Appellants point to the language of section 104(d) of the Materials Act to support their contention that their FOIA requests should proceed. Section 104(d), note following 44 U.S.C. § 2107 (Supp. V 1975), provides:
 
 
 8
 The provisions of this title shall not in any way affect the rights, limitations or exemptions applicable under the Freedom of Information Act, 5 U.S.C. § 552 et seq.
 
 
 9
 In spite of the seemingly clear language of section 104(d), appellees contend that various principles of statutory construction mandate that the Materials Act be interpreted to block these FOIA requests.[12] However, "even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent." National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). See Neuberger v. Commissioner, 311 U.S. 83, 88, 61 S.Ct. 97, 85 L.Ed. 58 (1940). Accordingly, we have examined the legislative history of section 104(d) and we conclude that the Materials Act does not bar processing of FOIA requests for the presidential materials in question.
 
 
 10
 Section 104(d) had its genesis in the report of the House Committee on House Administration,[13] which substituted a House version of the Materials Act for that passed by the Senate.[14] The report explicitly stated that none of the Materials Act's provisions regarding access to materials "are intended to limit access by the public, otherwise granted by the Freedom of Information Act."[15] When the bill was returned to the Senate, Senator Nelson offered a floor amendment to codify the expressed intent of the House Committee. The amendment became section 104(d). 120 Cong.Rec. 38532 (1974). In the subsequent House debate that preceded approval of the Senate amendment, Representative Brademas explained that the amendment "is intended to make clear that access to the material which may otherwise be authorized by the Freedom of Information Act shall not be limited by the provisions of this title." 120 Cong.Rec. 38646 (1974). With the purpose of congressional action so clear, our conclusion follows the "cardinal principle" of legislative interpretation: to give effect to the intent of Congress. City of New York v. Train, 161 U.S.App.D.C. 114, 123, 494 F.2d 1033, 1042 (1974), Aff'd, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975).
 
 
 11
 The appellees suggest, however, that the interpretation of section 104(d) we adopt may cause constitutional difficulties. The appellees argue that release of presidential materials without the specific statutory safeguards embodied in section 104(a)[16] might impair Mr. Nixon's constitutional rights. This contention is based on appellees' reading of Nixon v. Administrator, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). The Supreme Court, upholding the Materials Act in face of Mr. Nixon's claim that the archival screening process would impair his constitutional right to privacy, focused attention on the specific provisions of the Act that protect Mr. Nixon's privacy. The Court concluded:
 
 
 12
 (A)ppellant has a legitimate expectation of privacy in his personal communications. But the constitutionality of the Act must be viewed in the context of the limited intrusion of the screening process, of appellant's status as a public figure, of his lack of any expectation of privacy in the overwhelming majority of the materials, of the important public interest in preservation of the materials, and of the virtual impossibility of segregating the small quantity of private materials without comprehensive screening. When this is combined with the Act's sensitivity to appellant's legitimate privacy interests, see § 104(a)(7), the unblemished record of the archivists for discretion, and the likelihood that the regulations to be promulgated by the Administrator will further moot appellant's fears that his materials will be reviewed by "a host of persons," Brief for Appellant 150, we are compelled to agree with the District Court that appellant's privacy claim is without merit.
 
 
 13
 433 U.S. at 465, 97 S.Ct. at 2801 (footnote omitted). Even if, as Mr. Nixon asserts, the Materials Act's protection of his interests was the "touchstone" for the decision in Nixon v. Administrator, see Brief for Appellee Nixon at 7, Mr. Nixon's asserted constitutionally based privacy interests in some of the materials now under government control[17] will not be infringed by our decision today, which merely allows FOIA requests to proceed unhindered by the Materials Act. After this case returns to district court, Mr. Nixon will be free to raise constitutional objections to screening or disclosure carried on pursuant to any specific FOIA request. In the event a district court finds that any request for particular papers will lead to impingement upon Mr. Nixon's constitutional rights, it has the equitable power to protect Mr. Nixon's constitutional interests. See Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Ex parte Young, 209 U.S. 123, 149, 167-68, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv.L.Rev. 1532, 1540-43 (1972). See also 5 U.S.C. § 552(b)(6) (1976).[18]
 
 
 14
 Mr. Nixon also contends that screening of documents mandated by an FOIA request will disrupt the screening undertaken to carry out the Materials Act. Like the constitutional argument previously discussed, this objection does not address whether the FOIA requests can go forward, but merely raises concerns with the procedures by which processing of the requests may be carried out. We believe that fears of massive disruption by requests for huge, vaguely defined chunks of presidential material are largely unfounded. The FOIA specifically requires that requests such as the ones made here "reasonably describe ( )" the records sought. 5 U.S.C. § 552(a)(3)(A) (1976). See Fonda v. CIA, 434 F.Supp. 498, 501 (D.D.C.1977), Remanded sub nom. Hayden v. CIA, No. 77-1984 (D.C.Cir. Nov. 15, 1978) (per curiam). See also K. Davis, Administrative Law of the Seventies, § 3A.9-1 (1976); Note, Developments Under the Freedom of Information Act 1974, 1975 Duke L.J. 416, 439-40 n. 105 (1975); Note, The Freedom of Information Act Amendments of 1974: An Analysis, 26 Syracuse L.Rev. 951, 959-60 (1975). In any event, the possible duplication of effort arising from availability of records under both the FOIA and the Materials Act cannot negate the clear intent of Congress to preserve rights of access under the FOIA.
 
 III
 
 15
 In conjunction with their FOIA action, appellants sought a declaration that Mr. Nixon's presidential materials are owned by the United States. The district court dismissed the declaratory judgment action as moot on the ground that the provisions of the Materials Act gave custody and control of these presidential materials to the government.[19] The Materials Act itself leaves open the specific issue whether the United States owns the materials. See H.Rep. No. 93-1507, 93d Cong., 2d Sess. 7 (1974); 120 Cong.Rec. 33850-51 (1974) (remarks of Sen. Nelson). Section 105(a) vests exclusive jurisdiction in the United States District Court for the District of Columbia to hear, Inter alia, Any action involving the question of ownership.
 
 
 16
 As the district court recognized, an issue is moot if it has lost its character as a present, live controversy. See Nixon v. Sampson, 437 F.Supp. at 655 (citing Diffenderfer v. Central Baptist Church, 404 U.S. 412, 415, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972)); See generally Alton & Southern Railway v. IAM, 150 U.S.App.D.C. 36, 40-41, 463 F.2d 872, 876-77 (1972). With respect to access under the FOIA, the ownership issue is not moot, because neither the Materials Act nor Nixon v. Administrator,[20] resolved the issue or changed its character. Accordingly, we hold that the ownership issue is not moot.[21]
 
 
 17
 Reversed and remanded.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 See 10 Weekly Comp. of Pres. Doc. 1104, 1108-09 (Sept. 8, 1974); Nixon v. Sampson, 389 F.Supp. 107, 160-62 (D.D.C.1975) (Appendix A)
 
 
 [2]
 See Nixon v. Sampson, C.A. No. 74-1518 (D.D.C. filed Oct. 17, 1974)
 
 
 [3]
 See Nixon v. Sampson, 389 F.Supp. at 117
 
 
 [4]
 Appellants include The Reporters Committee for Freedom of the Press, American Historical Association, American Political Science Association, James MacGregor Burns, Nat Hentoff, Donald G. Herzberg, William Leuchtenburg, Arthur Link, J. Anthony Lukas, Austin Ranney and Clement E. Vose
 
 
 [5]
 Reporters Committee for Freedom of the Press v. Sampson, C.A. No. 74-1533 (D.D.C. filed Oct. 21, 1974); See Appendix (App.) at 20 (Complaint of the Reporters Committee for Freedom of the Press, et al.). For a description of the FOIA request, See id. at 45-49
 
 
 [6]
 Hellman v. Sampson, C.A. No. 74-1551 (D.D.C. filed Oct. 24, 1974)
 
 
 [7]
 Section 105(a) of the Presidential Recordings and Materials Preservation Act (the Materials Act), note following 44 U.S.C. § 2107 (Supp. V 1975), provides:
 The United States District Court for the District of Columbia shall have exclusive jurisdiction to hear challenges to the legal or constitutional validity of this title or of any regulation issued under the authority granted by this title, and any action or proceeding involving the question of title, ownership, custody, possession, or control of any tape recording or material referred to in section 101 or involving payment of any just compensation which may be due in connection therewith. Any such challenge shall be treated by the court as a matter requiring immediate consideration and resolution, and such challenge shall have priority on the docket of such court over other cases.
 
 
 [8]
 C.A. No. 74-1852 (D.D.C. filed Dec. 20, 1974)
 
 
 [9]
 Prior to the issuance of the district court's opinion in Nixon v. Sampson, this court denied Mr. Nixon's petition for mandamus to require the district judge to act immediately on his request for a three-judge court pursuant to 28 U.S.C. § 2282 (1970) and to give the constitutional challenge priority over a decision in the consolidated cases. Although this court denied Mr. Nixon's petition, it ordered the district court to consider the three-judge question before taking further action on the consolidated cases. Nixon v. Richey, 168 U.S.App.D.C. 169, 172, 513 F.2d 427, 430 (1975) (per curiam). The same day, the district court judge issued an opinion in the consolidated cases, Nixon v. Sampson, 389 F.Supp. 107 (D.D.C.1975), but the entry of the order was stayed. See Nixon v. Richey, 168 U.S.App.D.C. 172, 174, 513 F.2d 430, 432 (1975) (per curiam). A three-judge court was subsequently convened and the court in Nixon v. Richey directed that the stay be continued until the three-judge court asked it to be lifted, or until the three-judge court reached a decision. 168 U.S.App.D.C. at 190, 513 F.2d at 448. The original district court judge thereafter recused himself from participation in the consolidated cases, and another district judge was assigned to them. App. at 13. That district judge later refused a request that he enter judgment in accord with the original Nixon v. Sampson opinion. Nixon v. Sampson, 437 F.Supp. 654, 655 n. 5 (D.D.C.1977)
 
 
 [10]
 The three-judge court noted that regulations had yet to be promulgated pursuant to the access provision of the Materials Act, section 104(a), note following 44 U.S.C. § 2107 (Supp. V 1975), which provides:
 The Administrator shall, within ninety days after the date of enactment of this title (Dec. 19, 1974), submit to each House of the Congress a report proposing and explaining regulations that would provide public access to the tape recordings and other materials referred to in section 101. Such regulations shall take into account the following factors:
 (1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term "Watergate";
 (2) the need to make such recordings and materials available for use in judicial proceedings;
 (3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;
 (4) the need to protect every individual's right to a fair and impartial trial;
 (5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;
 (6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1); and
 (7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.
 See Nixon v. Administrator, 408 F.Supp. 321, 335 (D.D.C.1976). The court, therefore, explicitly did not decide "constitutional claims directed at the regulations . . . that the promulgation of regulations might eliminate, limit, or cast in a different light." Id. at 336. The GSA, after three unsuccessful attempts, finally promulgated regulations that were not disapproved by one House of Congress pursuant to section 104(b)(2) ("The Administrator may not issue any regulation or make any change in a regulation if such regulation or change is disapproved by either House of the Congress under this subsection."). See Nixon v. Warner Communications, Inc., 435 U.S. 589, 605-06 n. 16, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). The final regulations appear at 42 Fed.Reg. 63626 (1977). Mr. Nixon has challenged the regulations. Nixon v. Solomon, C.A. No. 77-1395 (D.D.C. filed Aug. 10, 1977).
 
 
 [11]
 Like the district court, the Supreme Court limited its consideration to those constitutional claims "address(ing) the facial validity of the provisions of the Act requiring the Administrator to take the recordings and materials into the Government's custody subject to screening by Government archivists." Nixon v. Administrator, 433 U.S. 425, 439, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). In affirming the district court, the Supreme Court rejected constitutional claims based on separation of powers, presidential privilege, right of privacy, right of associational privacy and political speech, and the bill of attainder clause. Id. at 439-484, 97 S.Ct. 2777, 2815
 
 
 [12]
 The government appellees invoke the principle of Brown v. GSA, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976), which states that "a precisely drawn, detailed statute pre-empts more general remedies," to reach its conclusion that the particular terms of the Act provide the exclusive access to these presidential materials. Brown v. GSA held that section 717 of the Civil Rights Act of 1964 provides the exclusive judicial remedy for claims of discrimination in federal employment. Id. at 835, 96 S.Ct. 1961. The Supreme Court was forced to resort to principles of statutory interpretation because "Congress simply failed explicitly to describe § 717's position in the constellation of antidiscrimination law." Id. at 825, 96 S.Ct. at 1964. Here Congress has explicitly related the operation of the FOIA to the Materials Act
 The government appellees also argue that allowing FOIA requests to proceed would lead to an absurd result incompatible with the structure of the Materials Act. However, we believe that the existence of an alternate method of access is completely compatible with Congress's intent to guarantee that materials from the Nixon presidency were available to the public; See 120 Cong.Rec. at 33971-72 (1974) (remarks of Sen. Nelson); Id. at 33855 (remarks of Sen. Ervin); Id. at 37900-01 (remarks of Rep. Brademas); Id. at 37905 (remarks of Rep. McKinney); H.Rep. No. 93-1507, 93d Cong., 2d Sess. 2 (1974). After all, when the Materials Act was passed, Congress could well have believed that the FOIA would not cover all of Mr. Nixon's materials that related to Watergate or were of general historical interest. See 5 U.S.C. § 552(e) (1976); S.Rep. No. 93-1200, 93d Cong., 2d Sess. 15 (1974); Soucie v. David, 145 U.S.App.D.C. 144, 149-153, 448 F.2d 1067, 1072-76 (1971).
 
 
 [13]
 H.Rep. No. 93-1507, 93d Cong., 2d Sess. (1974)
 
 
 [14]
 120 Cong.Rec. 33975 (1974)
 
 
 [15]
 H.Rep. No. 93-1507 at 5
 
 
 [16]
 See n. 10 Supra
 
 
 [17]
 The Supreme Court noted that "appellant's privacy claim embracing, for example, 'extremely private communications between (him) and, among others, his wife, his daughters, his physician, lawyer, and clergyman, and his close friends as well as personal diary dictabelts and his wife's personal files,' 408 F.Supp. at 359, relates only to a very small fraction of the massive volume of official materials with which they are presently commingled." Nixon v. Administrator, 433 U.S. at 459, 97 S.Ct. at 2798 (footnote omitted)
 
 
 [18]
 See generally Nixon v. Sampson, 389 F.Supp. at 157-60. Although the Nixon v. Sampson opinion is not precedent, it is of historical interest. Brandon v. Eckard, 187 U.S.App.D.C. 28, 31-32 n. 15, 569 F.2d 683, 686-87 n. 15 (1977)
 
 
 [19]
 Section 101 of the Materials Act, note following 44 U.S.C. § 2107 (Supp. V 1975), provides:
 (a) Notwithstanding any other law or any agreement or understanding made pursuant to section 2107 of title 44, United States Code any Federal employee in possession shall deliver, and the Administrator of General Services (hereinafter in this title referred to as the 'Administrator') shall receive, obtain, or retain, complete possession and control of all original tape recordings of conversations which were recorded or caused to be recorded by any officer or employee of the Federal Government and which
 (1) involve former President Richard M. Nixon or other individuals who, at the time of the conversation, were employed by the Federal Government;
 (2) were recorded in the White House or in the office of the President in the Executive Office Buildings located in Washington, District of Columbia; Camp David, Maryland; Key Biscayne, Florida; or San Clemente, California; and
 (3) were recorded during the period beginning January 20, 1969, and ending August 9, 1974.
 (b)(1) Notwithstanding any other law or any agreement or understanding made pursuant to section 2107 of title 44, United States Code, the Administrator shall receive, retain, or make reasonable efforts to obtain, complete possession and control of all papers, documents, memorandums, transcripts, and other objects and materials which constitute the Presidential historical materials of Richard M. Nixon, covering the period beginning January 20, 1969, and ending August 9, 1974.
 (2) For purposes of this subsection, the term "historical materials" has the meaning given it by section 2101 of title 44, United States Code.
 
 
 [20]
 The Supreme Court held that legal title to the presidential materials was irrelevant to disposition of Mr. Nixon's constitutional claims. Nixon v. Administrator, 433 U.S. at 445-46 n. 8, 97 S.Ct. 2777
 
 
 [21]
 Although we hold that the ownership issue is not moot, the district court is free to examine whether this request for declaratory action fulfills other justiciability requirements. Specifically, the district court may wish to examine whether these plaintiffs have established their standing to litigate in a declaratory judgment action the question of whether the government or Mr. Nixon is the owner of all these materials, See Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72-78, 98 S.Ct. 2620, 2630-2633, 57 L.Ed.2d 595 (1978); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and whether the issue presented here is suitable for resolution by declaratory judgment, See Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Of course, to the extent that the ownership of particular materials becomes an issue in the course of litigating an FOIA request for those materials in this or any other case, the FOIA plaintiffs will have standing to litigate that ownership question as well as all other issues relevant to their claim